[Cite as *Tilly v. Dublin*, 2013-Ohio-4930.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Drew Tilley,                                          :

    Plaintiff-Appellant,              :

                                      No. 12AP-998

v.                                                   :          (C.P.C. No. 11CVH-06-7377)

City of Dublin,                                      :          (REGULAR CALENDAR)

    Defendant-Appellee.              :

---

D E C I S I O N

Rendered on November 7, 2013

---

*Daniel H. Klos*, for appellant.

*Isaac, Brant, Ledman & Teetor*, *LLP*, *Jeffrey A. Stankunas* and *Julia R. Baxter*, for appellee.

---

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Plaintiff-appellant, Drew Tilley ("Tilley" or "plaintiff"), appeals from a judgment of the Franklin County Court of Common Pleas granting the summary judgment motion of defendant-appellee, City of Dublin ("City"). Because Tilley failed to establish a prima facie case of age discrimination, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On June 16, 2011, Tilley filed a complaint against the City alleging a claim of age discrimination under R.C. 4112.14. Tilley had worked for the City for 18 and one-half years as a sewer and maintenance worker before the City terminated his employment on October 1, 2009.

{¶ 3}   The events giving rise to the complaint began in 2008, when Mark Riley, a streets and utilities crew supervisor for the City and an African-American, spoke with Ron Burns, the director of the City's streets and utilities department regarding racially derogatory remarks being made by the City's maintenance workers.   These remarks included "the use of the word 'nigger.' " (Foegler Depo., exhibit No. 1.)  The City conducted an investigation into the allegations, ultimately interviewing 24 different employees.  The investigation revealed that City employees Doug Ballinger, Adam Parker, Skip Moerch, Matt McDade, and Randy Otis either used racially offensive language in the workplace or participated in conversations which included racially offensive slurs and epithets.  The City found such conduct violated the City's Administrative Order 2.49, Section 21.1 of the collective bargaining agreement ("CBA") between the City and the employees' union, and the City's Core Values.[1]   As a result of these findings, the City terminated Ballinger, Moerch, McDade, and Otis; Parker received a 30-day suspension.

{¶ 4}   The terminated employees grieved their terminations pursuant to the CBA's grievance procedure, which allowed the City to first respond to the grievance before the union decided whether to advance the grievance to arbitration.  The grievances filed by Ballinger, Moerch, McDade, and Otis all proceeded to arbitration.  On June 25, 2009, as the City's legal counsel prepared for Otis' arbitration, counsel "were told Drew Tilley used the term 'nigger', as well as other racially offensive words when addressing Charlie Edwards (former African American Streets and Utilities Maintenance Worker)."  (Foegler Depo., exhibit No. 4.)   Counsel also received information indicating that someone had once cut off Edwards air supply while he was working in a manhole.

{¶ 5}   On July 7, 2009, the City began an investigation into the allegations against Tilley.  During this investigation, Burns with the assistance of City employees Beth Lozier and Jennifer Miglietti, interviewed 15 individuals.  As reflected in the September 9, 2009

---

[1] Administrative Order 2.49 provides that "disrespectful, malicious, or abusive conduct/behavior" is "strictly prohibited and shall not be tolerated." (Tilley Depo., exhibit No. 1.)   The City's Core Values include the value of respect, through which the City strives to "embrace diversity and acknowledge the * * * inherent worth of each individual."  (Tilley Depo., exhibit No. 1.)  Section 21.1 of the CBA provides that no bargaining unit employee shall be disciplined without cause. Discipline for cause may include "the violation of City/Departmental/Divisional rules and regulations, * * * immoral conduct, * * * discourteous treatment, * * * [or] any conduct unbecoming an employee." (Tilley Depo., exhibit No. 3.)

memo from Burns, Lozier, and Miglietti to Dave Harding, the City's Director of Human Resources, the investigation resulted in the following findings:

> 1. Tilley regularly used the term 'nigger' when speaking with Edwards. Although the time frames are unclear, Edwards' testimony states this began many years ago and did not stop until approximately April of 2008. Both Doug Denk (former S&U Crew Supervisor) and Paul Evans (S&U Fulltime Maintenance Worker) corroborate Tilley's use of the work [sic] 'nigger' as described by Edwards.
>
> 2. There is no evidence Edward's air supply was cut off while he was working in a manhole in Donegal Cliffs Park during the spring or early summer of 2008.
>
> 3. Tilley was untruthful during his testimony. Although Tilley denie using the word 'nigger' as Edwards alleges, two other credible witnesses state they heard Tilley call Edwards 'nigger' multiple times.

(Foegler Depo., exhibit No. 4.)

{¶ 6} The City found Tilley's use of racial slurs violated Administrative Order 2.49, Section 21.1 of the CBA, and the City's Core Values. As such, the City terminated Tilley's employment.

{¶ 7} Tilley filed a grievance with his union regarding the termination on October 6, 2009, asserting that the investigation was untimely and that the discipline he received was unjust. The City initially denied Tilley's grievance, finding the investigation occurred shortly after the City learned of the allegations against Tilley, and finding that the discipline was just considering the conduct at issue.

{¶ 8} On January 21, 2010, the union informed the City that it would not forward Tilley's grievance to arbitration. Although the union did not state its reason for withdrawing the grievance, Tilley alleged in his complaint that the union withdrew the grievance after it learned that Tilley retired on November 19, 2009. Tilley explained that he retired at that time as he had no other income source.

{¶ 9} McDade and Moerch both received final and binding arbitrator's decisions sustaining their grievances and ordering the City to reinstate them with back pay. The arbitrator also issued an 83-page decision sustaining Otis' grievance and ordering the City

to reinstate him with back pay.  The City planned to file a motion to vacate the 83-page decision, as the City believed the report was defamatory and concerned matters from outside the scope of the arbitration.  The City did not pursue the motion to vacate, however, as it was able to enter into a settlement agreement with Otis on December 17, 2009.  Pursuant to the agreement, Otis agreed to dismiss his grievance and release the City from any claims he may have had, the City agreed to reinstate Otis with back pay, and both parties agreed to consider the arbitrator's decision null and void.

{¶ 10} The City also entered into a settlement agreement with Ballinger on January 11, 2010 before the arbitrator heard the case.  Ballinger's grievance was the last to proceed to arbitration and, as the three prior arbitrations resulted in favorable decisions for the employees, the City "felt there was a significant risk that we would lose [Ballinger's] case at arbitration."  (Harding Depo., 83.)  Pursuant to the terms of the settlement agreement, the City amended Ballinger's discipline from discharge to a five working day suspension, Ballinger agreed to dismiss the grievance and release the City from any claim he may have had, and the City agreed to reinstate Ballinger to his former position with back pay.

{¶ 11} On January 28, 2010, Tilley drafted a letter to City officials which stated simply "I Drew Tilley would like to have my job back."  (Complaint, exhibit No. 1.)  The City responded on February 22, 2010, thanking Tilley for his interest in being rehired as a maintenance worker, but stating that "after due consideration of your request, a decision has been made not to rehire you to a Maintenance Worker position at the City of Dublin." (Complaint, exhibit No. 2.)

{¶ 12} Four months after receiving the City's response, Tilley filed his complaint against the City.  Tilley noted that he was 60-years old at the time of his termination, while the employees discharged as a result of the 2008 investigation were under the age of 50 at the time they were terminated.  Tilley asserted in his complaint that, as the City did not provide a reason to support its decision not to rehire him, the reason must have been his age.  At his deposition, Tilley explained that the City "had all the chances in the world to bring [him] back, and the only thing [he could] come up with [was his] age, because they brought everybody else back."  (Tilley Depo., 12.)

{¶ 13} On March 22, 2012, the City filed a Civ.R. 56 motion for summary judgment. The City asserted that Tilley's complaint alleged cases for age discrimination regarding both his termination and the City's refusal to rehire him. The City asserted that Tilley could not establish a prima facie case of discrimination, and that the City had legitimate and non-discriminatory reasons to support the adverse employment actions. The City noted that it fired Tilley for cause under the CBA after an investigation revealed that Tilley used racial slurs against a co-worker, and noted that there was no arbitrator's order obligating the City to reinstate Tilley. The City further noted that, due to the economic conditions prevailing at the time Tilley requested his job back, the City had implemented a general hiring freeze for non-essential positions.

{¶ 14} Tilley responded to the City's motion for summary judgment on April 14, 2012. In his memorandum contra, Tilley attacked the credibility of the evidence produced by the City in the 2008 and 2009 investigations. Tilley asserted that there were "reasonable inferences that a jury could draw from the evidence that the conclusions drawn by the Defendant were a sham to get rid of Mr. Tilley," as the "amount of evidence collected in the first and second investigatory interviews that supported Mr. Tilley's denial of having used inappropriate language in the workplace far outweigh[ed] the allegation that he did." (Memorandum Contra, 11.)

{¶ 15} The trial court filed its decision granting the City's motion for summary judgment on October 26, 2012. The court initially found that Tilley failed to present sufficient evidence to support a prima facie case of age discrimination. The court further found that, even if Tilley had satisfied his prima facie case, the City had presented legitimate, non-discriminatory reasons which justified the termination and the failure to rehire Tilley. The court further concluded that Tilley failed to present any evidence demonstrating that the City's proffered reasons were a pretext for discrimination.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Tilley appeals, assigning the following assignments of error:

> 1. THE COURT ERRED WHEN IT FOUND THAT THE PLAINTIFF FAILED IN THE THIRD ELEMENT OF A PRIMA FACIE CASE BECAUSE HE WAS NOT QUALIFIED FOR HIS JOB BECAUSE OF HIS CONDUCT AND NOT HIS AGE.

2. THE COURT ERRED WHEN IT FOUND THAT THE PLAINTIFF FAILED IN THE FOURTH ELEMENT OF A PRIMA FACIE CASE BECAUSE HE WAS NOT QUALIFIED FOR HIS JOB BECAUSE HE WAS NOT HIRED AND NOT REPLACED BY A YOUNGER PERSON.

3. THE COURT ERRED WHEN IT FOUND THAT THE PLAINTIFF FAILED TO PRESENT ANY EVIDENCE THAT THE REASONS PROFERRED BY THE DEFENDANT WERE PRETEXT FOR DISCRIMINATION.

4. THE COURT ERRED IN DETERMINING THAT THE PLAINTIFF FAILED TO PRESENT ANY EVIDENCE THAT THE REASONS PROFFERED BY THE DEFENDANT WERE PRETEXT FOR DISCRIMINATION PURSUANT TO THE SECOND SHOWING OF DISCRIMINATION DEFINED IN *MANZER V DIAMOND SHAMROCK CHEMICALS CO.*, 29 F.3D 1078, 1084 (6TH CIR. 1994).

5. THE COURT ERRED WHEN IT DETERMINED THAT THE COWORKERS MOERCH, BALLINGER, OTIS AND MCDADE WERE NOT COMPARABLES BECAUSE THEY ALLEGEDLY RACIALLY HARASSED AFRICAN-AMERICAN MR. RILEY AND MR. TILLEY ALLEGEDLY RACIALLY HARASSED AFRICAN-AMERICAN MR. EVANS.

{¶ 17} We will address Tilley's second and fifth assignments of error together, as they are dispositive of the appeal.

## III. STANDARD OF REVIEW

{¶ 18} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 19} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving

party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 20} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.* If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Id.*

## IV. *McDONNELL DOUGLAS* ANALYSIS

{¶ 21} Plaintiff's complaint asserted a claim of age discrimination under R.C. 4112.14. R.C. 4112.14(A) provides that "[n]o employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee." *See also* R.C. 4112.02(A) and 4112.99. In deciding cases brought under R.C. 4112.14 and 4112.02, Ohio courts may rely on federal anti-discrimination case law. *See Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 582 (1996).

{¶ 22} "To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent"; a plaintiff may establish such intent by either direct or indirect methods of proof. *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998), citing *Mauzy* at 583. When a plaintiff seeks to establish age discrimination

indirectly, as here, the plaintiff may establish discriminatory intent by utilizing the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as first adopted and modified by Ohio courts in *Barker v. Scovill, Inc., Schrader Bellows Div.*, 6 Ohio St.3d 146 (1983), and lastly by *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723.

{¶ 23} The plaintiff must first establish a prima facie case of age discrimination. By satisfying the prima facie case, the plaintiff creates a presumption that the employer unlawfully discriminated against the employee. *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 11. A prima facie case of employment discrimination may be established by proof (1) that the plaintiff was a member of a protected class, (2) that the plaintiff suffered an adverse employment action, (3) that the plaintiff was qualified for the position they lost, and (4) either that the plaintiff was replaced by someone outside the protected class, *see McDonnell Douglas Corp.* at 802, or that "a comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992), citing *Davis v. Monsanto Chem. Co.*, 858 F.2d 345 (6th Cir.1988). In *Coryell*, the court further modified the fourth element of the prima facie analysis, stating that the plaintiff must establish that they were "replaced by * * * a person of substantially younger age." *Id.* at paragraph one of the syllabus, modifying and explaining *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501 (1991), syllabus. The *Coryell* court declined to define "substantially younger," explaining that the term " 'substantially younger' as applied to age discrimination in employment cases defies an absolute definition and is best determined after considering the particular circumstances of each case." *Id.* at ¶ 23.

{¶ 24} Plaintiff alleged that the City discriminated against him by failing to rehire him after he requested his former job back. "In order to make out a prima facie case of age discrimination in a failure-to-rehire situation, a plaintiff must meet a modified *McDonnell Douglas* test." *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir.1989). A plaintiff can establish a prima facie case of age discrimination from an employer's failure to rehire them if they can establish the following: (1) they are a member of a protected age group, (2) they are qualified for the rehire or recall position, (3) they applied for the available position or can establish that the employer was otherwise obligated to consider him, and (4) that the position went to a substantially younger individual, or "that other

reasonable evidence exists for inferring that he was denied a position because of his age." *Id.*

{¶ 25} If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for discharging the employee. *Caldwell v. Ohio State Univ.*, 10th Dist. No. 01AP-997, 2002-Ohio-2393, ¶ 61, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The employer meets its burden of production by submitting admissible evidence which " '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.' " (Emphasis sic.) *Williams* at ¶ 12, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "At this point, the presumption created by the prima facie case drops from the case because the employer's evidence has rebutted the presumption of discrimination." *Williams* at ¶ 12, citing *St. Mary's* at 510.

{¶ 26} If the employer presents a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons are merely a pretext for unlawful discrimination. *Barker* at 148. " 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Ohio Univ. v. Ohio Civ. Rights Comm.*, 175 Ohio App.3d 414, 2008-Ohio-1034, ¶ 67 (4th Dist.), quoting *Burdine* at 253.

## V. SECOND AND FIFTH ASSIGNMENTS OF ERROR—PRIMA FACIE CASE

{¶ 27} Plaintiff's second and fifth assignments of error assert that the trial court erred in its analysis of the final element of the prima facie case. As noted above, under the fourth element of the prima facie case, a plaintiff must establish either (1) that they were replaced by someone "substantially younger," *Coryell* at paragraph one of the syllabus; or (2) that "a comparable non-protected person was treated better." *Mitchell* at 582. In the failure-to-rehire context, a plaintiff must establish that the job went to a substantially younger person, or "that other reasonable evidence exists for inferring that he was denied a position because of his age." *Wanger* at 145.

{¶ 28} The trial court properly concluded that plaintiff failed to establish the fourth prong of his prima facie case under either scenario. The court found that the City had not replaced plaintiff with a substantially younger person, as it had not hired anyone to refill

Tilley's position with the City. The court also found that Tilley was not comparable with the individuals terminated as a result of the 2008 investigation. Regarding his failure to rehire claim, the trial court determined that the City did not hire anyone into Tilley's former position, and concluded that "there [was] no reasonable evidence for inferring that Plaintiff was denied a position because of his age." (Decision, 9.) The court addressed Tilley's argument that the lack of evidence implicating him in the 2008 investigation raised the inference that the City refused to rehire him because of his age, and concluded this argument failed. The court noted that "the 2008 investigation focused on allegations of racial harassment toward Mr. Riley, *not* Mr. Edwards," and the City terminated plaintiff and refused to rehire him because of the results of "the 2009 investigation regarding [his] alleged racial harassment toward Mr. Edwards." (Emphasis sic.) (Decision, 10.)

{¶ 29} The court did not err in its analysis. Under his second assignment of error, plaintiff cites to *Wanger* and asserts that he was "not required to show that his position went to that of a younger person," as he can "establish this element by showing that other reasonable evidence exists for inferring that he was denied a position because of his age." (Tilley's brief, 16.) Plaintiff, however, fails to cite to this court other reasonable evidence which demonstrates that the City refused to rehire him because of his age. As we find Tilley's failure to establish the fourth element of the prima facie case dispositive of this appeal, we will analyze each potential showing separately.

### A.  Replaced by a Substantially Younger Person

{¶ 30} Plaintiff failed to establish that the City replaced him with a substantially younger person. The evidence revealed that the City did not replace Tilley with a substantially younger person, as it did not hire anyone to replace him. City Manager, Terry Foegler, explained that the City implemented a general hiring freeze in 2009 due to the City's "first reduced revenue growth ever." (Foegler Depo., 31.) Accordingly, City officials informed city council that year that, "as a general policy we weren't refilling positions that became available through attrition unless we felt there was a significant service impact or public safety impact." (Foegler Depo., 31.) Harding noted in his deposition that, when the City received Tilley's request for his job back in February 2009,

there was no position to rehire Tilley into, as Tilley's former "job by that point had been abolished in the budget process."  (Harding Depo., 74-75.)

### B.  Comparable, Non-protected Employee Treated Better

{¶ 31} Plaintiff also failed to establish that the City treated a comparable non-protected employee better than it treated Tilley.  Plaintiff's fifth assignment of error asserts the trial court erred when it found that Moerch, Ballinger, Otis, and McDade were not comparable to plaintiff.  The court noted that, while these men made racial slurs against Riley, plaintiff made racial slurs against Edwards.  However, the court found the "crucial difference" between plaintiff and the other terminated employees, was that the City rehired the other individuals after "the Union pursued the other employees' grievances to final arbitration."  (Decision, 7.)  Because the City "was not faced with the threat of an arbitrator's binding order to reinstate Plaintiff, since he did not advance his grievances to final and binding arbitration like the other four employees' grievances," the court concluded that Tilley was not comparable to the other employees.  (Decision, 10.)

{¶ 32} Tilley asserts the court erred in finding that he was not comparable to Moerch, Ballinger, Otis, or McDade simply because they used racial slurs against a different individual.  Although the court noted that fact, the court found the crucial difference between plaintiff and the other four employees was that the union had forwarded the other employees' grievances to arbitration.

{¶ 33} In *Mitchell*, the court announced that a plaintiff may satisfy the fourth element of their prima facie case by establishing that a comparable non-protected person was treated better.  A plaintiff may satisfy this element by producing "evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees."  *Id.* at 583.  The record does not contain evidence reflecting the ages of Otis, McDade, Moerch, or Ballinger.  Plaintiff's complaint alleges that these men "were 10 to 25 years younger than Plaintiff," but does not provide specific ages.  (Complaint, ¶ 16.)

{¶ 34}  To make a comparison between the plaintiff's treatment and the treatment of non-protected employees, "the plaintiff must show that the 'comparables' are similarly-situated *in all respects.*"  (Emphasis sic.)  *Mitchell* at 583, citing *Stotts v. Memphis Fire Dept.*, 858 F.2d 289 (6th Cir.1988).  The Sixth Circuit later clarified that the plaintiff must

simply prove that " 'all of the *relevant* aspects of his employment situation were "nearly identical" to those of [the non-minority's] employment situation.' "   (Emphasis sic.) *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998), quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994).  To be deemed "similarly-situated," the comparables "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell* at 583.

{¶ 35} Here, Moerch, Ballinger, Otis, and McDade were maintenance workers for the City and had the same supervisor as plaintiff.  Although Moerch, Ballinger, Otis, and McDade used racially derogatory language against Riley, and plaintiff used racially derogatory language against Edwards, their conduct was similar.  Notably, the City took the same action against plaintiff that it took against the other employees: the City conducted an investigation, found the employees violated the same applicable governing provisions, and terminated the employees' employment.  Based on these similarities, plaintiff asserts that he is comparable with the other four men and that the City treated them more favorably than it treated him when it reinstated them.

{¶ 36} After the terminations, the situations of the four other employees took very different courses from Tilley's situation.  The union forwarded the grievances of the other employees to arbitration.  The union refused to forward Tilley's grievance to arbitration.  Harding explained the distinction between Tilley and the other four employees as follows:

> Three of those employees, Otis, McDade and Moerch, were reinstated by an arbitrator's award. The fourth, being Ballinger, was reinstated because the City felt there was significant risk that we would lose that case at arbitration, and in an effort to not exacerbate the backpay liability and not add to attorney's fees, the City sought to resolve that through settlement.
>
> Drew Tilley did not take his case through arbitration, so there was no threat to the City that we would possibly lose at an arbitration.

(Harding Depo., 83.)

{¶ 37} Plaintiff asserts that he is at least comparable with Otis and Ballinger, as the City reinstated these individuals pursuant to settlement agreements, and not pursuant to an arbitrator's order. Plaintiff fails to address the fact that Otis' arbitration had resulted in a final order obligating the City to reinstate him, and that Ballinger's grievance was about to proceed to arbitration. Accordingly, the City did not disregard the CBA grievance process, or simply reinstate Otis and Ballinger for no reason. Rather, it was because the union had advanced Otis's and Ballinger's grievances to arbitration, and the potential negative outcome the City faced at these arbitrations, which caused the City to enter into the settlement agreements with Otis and Ballinger. The union's act of forwarding the other four men's grievances to arbitration, but refusing to forward plaintiff's grievance to arbitration, provides the differentiating circumstances which distinguish the City's treatment of Moerch, McDade, Otis, and Ballinger from the City's treatment of Tilley. Accordingly, Tilley was not comparable to Otis, Ballinger, McDade, or Moerch. Tilley's fifth assignment of error is overruled.

### C. Other Reasonable Evidence for Inferring the City Refused to Rehire Tilley Because of His Age

{¶ 38} Finally, plaintiff failed to present reasonable evidence which would support the inference that the City refused to rehire him because of his age. In his memorandum contra the City's motion for summary judgment, plaintiff cited to various facts from the two investigations which he alleged demonstrated an inference that the City had refused to rehire him because of his age. This evidence does not support an inference of discrimination.

{¶ 39} Plaintiff first noted that, of the 24 individuals interviewed in the 2008 investigation, none accused Tilley of using racial slurs or epithets. The trial court rightly found this argument lacking in merit. The 2008 investigation concerned comments City employees made toward Riley, while Tilley's comments focused solely on Edwards. The 2008 investigation did not focus on Tilley's conduct. As such, no inference of discrimination rises from the fact that Tilley was not named in the 2008 investigation.

{¶ 40} Tilley also attacked the credibility of the three individuals the City relied on to support its finding that Tilley had used racially derogatory language in the workplace. The City relied on statements given by Edwards, Paul Evans, and Doug Denk. Although

Tilley notes that other individuals interviewed in the 2009 investigation stated they had not heard Tilley use racial slurs or epithets, the City felt that "corroboration among three individuals was sufficient for [the City] to have a reasonable belief that that conduct had been committed." (Harding Depo., 80-81.)

{¶ 41} In a July 7, 2009 interview, Edwards told Burns that Tilley "would address [Edwards] as 'Hi Nigger.' He used the term Nigger." (Foegler Depo., exhibit No. 5.) Edwards further indicated that Tilley would refer to him as "Bubba." (Foegler Depo., exhibit No. 5.) In a September 21, 2009 interview, Edwards reiterated that Tilley referred to him as "nigger," noting that he "had to bite his tongue when [Tilley] used the 'N' word. It hurt real bad." (Foegler Depo., exhibit No. 5.) Edwards had told Tilley "he wanted him to call him by his name." (Foegler Depo., exhibit No. 5.)

{¶ 42} Tilley asserted in the trial court that Edwards' allegations lacked credibility, as Edwards failed to make the allegations during the 2008 investigation. Tilley also asserted that Edwards' allegations became more "emotional" after Edwards left his employment with the City for a lower paying job. (Memorandum Contra, 9.) In the 2008 investigation report, the City noted that Edwards had indicated that he knew "a lot more about the questions [the City] asked [him]; however, [he was] unwilling to provide specific information and names because [he] fear[ed] retaliation." (Foegler Depo., exhibit No. 1.) Similarly, in the July 7, 2009 interview with Burns, Edwards indicated that he "couldn't say a whole lot while [he] was there," i.e. while he was employed by the City, because of "threats and stuff." (Foegler Depo., exhibit No. 5.) Moreover, when Burns asked Edwards if he would be willing to come in and testify before an arbitrator, Edwards stated: " 'Absolutely, I would be willing.' " (Foegler Depo., exhibit No. 5.) The fact that Edwards did not make the allegations against Tilley until after he was no longer employed by the City does not raise an inference that the City discriminated against Tilley on the basis of his age.

{¶ 43} Tilley also asserted that Evans interview statements lacked credibility as Evans stated that he could not remember "being with Tilley * * * at the same time with [Edwards]," and thus could not have heard Tilley make racist comments to Edwards. (Harding Depo., exhibit No. 5.) Plaintiff, however, took Evans comment out-of-context.

Migelitte's notes from the August 19, 2009 interview between Burns and Evans reflect the following information:

> Ron said that Drew Tilley often referred to [Charlie Edwards] in racial ways. Ron asked if [Paul Evans] had heard any of this. Paul said he had, but that he couldn't remember specifics. Ron explained Charlie stated that Drew would say "Good Morning, Nigger." Paul couldn't remember him greeting Charlie that way in the morning. Ron asked if Tilley referred to Charlie as "his nigger". Paul said yes – he had heard that but he couldn't remember specifics. Paul stated that he did hear the word nigger and [i]t was a few years ago. * * * Paul thought Charlie accepted the fact that Tilley called him nigger and that they thought it was funny because it was a daily thing.
>
> In May, June & July Charlie was in a man hole in Donegal Cliffs. Paul confirmed during that time Paul did work with Charlie then. Paul said he Charlie was very difficult to work with when he went in the hole. * * * Paul couldn't remember any such incident [referring to Charlie's air supply being cut off]. Paul couldn't remember ever being with Tilley or Brown at the same time with Charlie. Paul thought he would be [with] Ballinger, possibly Dan Wilson. * * * Paul couldn't imagine anyone doing this to be funny or as a joke. Charlie was always nervous/anxious when he went into a hole. Paul said it could have been an accident.

(Harding Depo., exhibit No. 5.)

{¶ 44} The above notes demonstrate that Evans heard Tilley refer to Edwards as "his nigger," and that such comments were a daily occurrence. The notes further reflect, in a separate paragraph, Burns questioning Evans regarding an incident which occurred while Edwards was in a manhole in Donegal Cliffs. Evans' comment, that he was never with Tilley and Edwards at the same time, is in reference to the manhole incident. Moreover, the City supported its motion for summary judgment with Evans' affidavit, in which Evans clarified that he did hear Tilley refer to Edwards as "his nigger," and explained that his comment regarding not being with Tilley and Edwards at the same time was solely in reference to the manhole incident. (Evans affidavit, ¶ 3, 4.) Evans' affidavit did not contradict his earlier interview statements. *Compare Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, paragraph three of the syllabus.

{¶ 45} Finally, Denk informed Burns during an August 12, 2009 interview that Tilley "would refer to Charlie as that – ('Bubba')," and that Tilley would "call Charlie 'his Nigger.' "  (Harding Depo., exhibit No. 5.)  Tilley asserted in the trial court that Denk's statements were unworthy of belief, as another employee accused Denk of calling Edwards the "n" word, and because Denk "said Jeff Stallings ha[d] heard Drew call Mr. Edwards 'Nigger,' " but Stallings denied hearing that word from Tilley.  (Memorandum Contra, 9.)

{¶ 46} In the 2008 investigation, Parker provided City officials with a statement indicating that Tilley had told him that Denk "called Charlie a nigger at a bar" while Denk, Edwards, and Tilley were out of town together.  (Harding Depo., exhibit No. 2.)  Such allegation did not render Denk's later interview statements unbelievable, especially as Denk stated that he would be willing to testify regarding Tilley's statements. Furthermore, as Tilley alleged, Stallings stated he had not heard Tilley refer to Edwards as "Nigger." (Harding Depo., exhibit No. 5.)  Stallings, however, stated he had heard Tilley use "the terms of chicken and watermelon * * * around Charlie," refer to Edwards as "my boy," and refer to Edwards as "Na" or "Ni."  (Harding Depo., exhibit No. 5.) Stallings stated that he "took 'Ni' or 'Na' to mean 'Nigger.' "  (Harding Depo., exhibit No. 5.) Accordingly, Denk personally heard Tilley refer to Edwards with the word "nigger," and Stallings also related several racial slurs which he had heard Tilley use against Edwards. The City's reliance on Edwards, Evans, and Denk's statements does not raise an inference that the City discriminated against Tilley on the basis of his age.

{¶ 47} Tilley also asserted that a trier of fact could infer that the City decided to not rehire Tilley because of his age because the City took approximately 20 days to respond to Tilley's request for his job back, and the response letter did not contain a reason to support the City's decision.  The City was not under an obligation to respond to Tilley's letter, let alone respond with each reason the City had to not rehire.  Foegler explained in his deposition that he discussed Tilley's request with other City officials who "would have been more familiar with the personnel issues" before deciding not to rehire Tilley. (Foegler Depo., 13.)  Harding stated that he discussed Tilley's request for his job back with Foegler and Harding's "recommendation was that we do not rehire Mr. Tilley given his prior termination for racial misconduct in the workplace."  (Harding Depo., 59.)  The 20-

day response time does not create a genuine issue of material fact regarding whether the City acted with a discriminatory intent in choosing to not rehire Tilley.

{¶ 48} In the final analysis, Tilley failed to establish the fourth element of either prima facie case, as he failed to present evidence indicating that he was replaced by a substantially younger person, that a comparable non-protected employee was treated better, or that other reasonable evidence existed to raise an inference that the City refused to rehire him because of his age. As Tilley failed to show that other reasonable evidence existed for inferring that the City refused to rehire him because of his age, Tilley's second assignment of error is overruled.

{¶ 49} Tilley's first assignment of error asserts the trial court erred in finding that Tilley was not qualified for the maintenance worker position. However, as we have determined that plaintiff failed to establish the fourth element of his prima facie case, we need not further consider whether other elements of the prima facie case were lacking. Because Tilley failed to establish a prima facie case of age discrimination, he failed to raise an inference of discrimination. As such, the burden to produce a legitimate, non-discriminatory reason never shifted to the City.

{¶ 50} Although the trial court concluded that plaintiff failed to establish a prima facie case of age discrimination, the court completed the *McDonnell Douglas* analysis as if "Plaintiff had satisfied all four elements for a prima facie case of discrimination." (Decision, 11.) Tilley's third and fourth assignments of error assert the trial court erred in finding that the City's legitimate, non-discriminatory reasons for its actions were not a pretext for discrimination. However, as Tilley failed to establish a prima facie case of age discrimination, we need not further consider whether the City's asserted reasons for firing and refusing to rehire him were a pretext for discrimination. *See Dautartas v. Abbott Laboratories*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶ 42 (noting that the "[a]ppellant's failure to establish a prima facie case of age discrimination through either direct or indirect methods of proof effectively ends [this court's] inquiry as a matter of law," and thus there was no reason to "proceed to the next two parts of the *McDonnell Douglas* analysis"); *Kowach v. Ohio Presbyterian Retirement Servs.*, 11th Dist. No. 2010-T-0033, 2010-Ohio-4428, ¶ 30 (same). Accordingly, our ruling on plaintiff's second and

fifth assignments of error render appellant's first, third and fourth assignments of error moot.

## VI. CONCLUSION

{¶ 51} Having overruled plaintiff's second and fifth assignments of error, thereby rendering plaintiff's first, third and fourth assignments of error moot, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and McCORMAC, JJ., concur.

McCORMAC, J., retired, formerly of the Tenth Appellate District, assigned to active duty under the Ohio Constitution, Article IV, Section 6(C).

_____