| | |
|---|---|
| PETER MCGINTY | Case No. 2018-00026JD |
| Plaintiff | Judge Patrick M. McGrath<br>Magistrate Holly True Shaver |
| v. | |
| | <u>DECISION</u> |
| THE OHIO STATE UNIVERSITY | |
| Defendant | |

{¶1} Plaintiff brought this action alleging discrimination and retaliation in employment against defendant, The Ohio State University (OSU). The court granted summary judgment in favor of defendant on plaintiff's claims of retaliation and determined that Adrienne Nazon was entitled to civil immunity pursuant to R.C. 9.86. The case went to trial before a magistrate on plaintiff's remaining claims of reverse race and sex discrimination. The magistrate issued a decision recommending judgment for OSU. Plaintiff timely filed objections to the magistrate's decision and defendant did not file a response. The objections are now before the court for consideration. For the reasons set forth below, the court shall overrule plaintiff's objections and adopt the decision of the magistrate as its own.

**Standard of Review**

{¶2} Civ.R. 53(D)(3)(b)(i) provides, "A party may file written objections to a magistrate's decision within fourteen days of the filing of the decision, whether or not the court has adopted the decision during that fourteen-day period as permitted by Civ.R. 53(D)(4)(e)(i)." "Whether or not objections are timely filed, a court may adopt or reject a magistrate's decision in whole or in part, with or without modification." Civ.R. 53(D)(4)(b). The court "shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues, and appropriately applied the law." Civ.R. 53(D)(4)(d). In reviewing the objections, the court

does not act as an appellate court but rather conducts "a de novo review of the facts and conclusions in the magistrate's decision." *Ramsey v. Ramsey*, 10th Dist. Franklin No. 13AP-840, 2014-Ohio-1921, ¶ 17 (citations omitted). Objections "shall be specific and state with particularity all grounds for objection." Civ.R. 53(D)(3)(b)(ii). An objection to a factual finding must be supported "by a transcript of all the evidence submitted to the magistrate relevant to that finding or an affidavit of that evidence if the transcript is not available." Civ.R. 53(D)(3)(b)(iii).

**Factual Background**

{¶3} Plaintiff, a white male, brings claims for reverse race and sex discrimination pursuant to R.C. 4112. Plaintiff was employed as the Senior Associate Vice President for OSU's marketing department. Prior to joining OSU marketing, plaintiff began his employment at OSU as an Associate Vice President of Strategic Marketing and Communications in the Office of Enrollment Services. In 2016, plaintiff applied for a new position at OSU, as the Chief Marketing Officer, which would serve as a marketing leader for the entire university. Although plaintiff was interviewed for this position, Adrienne Nazon, a black female, was ultimately selected.

{¶4} Instead, plaintiff was asked to interview for a position that would serve as Nazon's "number two," during which Nazon was one of the interviewers. In addition to Nazon, plaintiff was also interviewed by Justin Fincher, Mike Eicher, and Dolan Evanovich—all of whom are white males. Plaintiff estimated that he met with Nazon approximately four times before he was selected to serve as Senior Assistant Vice President (Senior AVP) in mid-February of 2016. As a Senior AVP, plaintiff's annual salary in fiscal year 2017 was $232,875.12. (Defendant's Exhibit BB.)

{¶5} As a part of his responsibilities, plaintiff assisted Nazon in interviewing other candidates to fill positions in the marketing department, during which time three Assistant Vice Presidents (AVPs) were hired, including Melissa Bailey-Harris, a black female, and Brian Aubert and Justin Winget, both of whom were white males. As an

AVP, Aubert was paid $160,000, and both Bailey-Harris and Winget were paid approximately $150,000 per year. (Defendant's Exhibits NNN, MMM.)

{¶6} Although plaintiff testified that he understood his role as Senior AVP meant he would serve as second-in-command to Nazon, plaintiff claims Nazon never "anointed" him as her "number two" in regard to the reporting structure. Instead, Nazon implemented a "matrix" reporting structure where individuals would report to more than one supervisor. Plaintiff did not like this structure and was also surprised that he had only two direct reports. Although he was paid significantly more than the other AVPs, plaintiff testified that he had no direct authority over them because of the matrix reporting structure. Nazon testified that it was her decision to structure the AVPs with a matrix reporting structure. Additionally, Nazon acknowledged that the matrix reporting structure was "unorthodox," and she told plaintiff that if it did not work, they could try something else.

{¶7} Despite plaintiff's issues with the reporting structure, plaintiff claimed that, in the beginning of their employment relationship, he liked Nazon and he believed that they worked well together. However, between July and December 2016, there were significant changes going on in the marketing department and turnover was high. During this time, plaintiff stated he had brought some issues to Nazon's attention, such as his views that the department was not accomplishing its goals, that they were hurting relationships with clients, and that they were "breaking bridges."

{¶8} One of plaintiff's concerns was Bailey-Harris. According to plaintiff, Bailey-Harris was dismissive and not receptive to his assistance. Plaintiff also described her as a "bully" and witnessed her threaten other staff. Despite multiple employees within the marketing department complaining about Bailey-Harris to Nazon, nothing was done to address Bailey-Harris' behavior. Plaintiff believed that Nazon protected Bailey-Harris. Moreover, prior to Bailey-Harris being employed at OSU, Nazon previously worked with

Bailey-Harris at the University of Chicago.  Additionally, Nazon recruited her for the AVP position at OSU, for which Bailey-Harris was the sole candidate interviewed.

{¶9} In December 2016, plaintiff had a meeting with Nazon to discuss his opinion regarding the problems in the marketing department.  Plaintiff testified that he was frank with his observations that Bailey-Harris had 25 to 30 employees reporting to her under the matrix structure, and the office was not getting work done.  Plaintiff told Nazon that if the current issues were not addressed, no progress could be made.  One solution plaintiff suggested, among others, was to restructure Bailey-Harris' workload and shift it to him because he believed that she had too many responsibilities.  Nazon reacted by becoming very angry and her tone changed.  According to plaintiff, Nazon said, "We're not changing.  You're going to have to change.  It's my way."  Nazon asked plaintiff what he wanted to do, and when plaintiff stated he did not know, she stated, "Bullshit. You know what you want to do."  After the meeting, plaintiff stated to himself "I think I just lost my job."  Plaintiff felt defeated, threatened, and unsafe.  Plaintiff realized then that the relationship between himself and Nazon changed.

{¶10} After the December meeting, Nazon treated plaintiff differently.  Nazon was more critical and dismissive of him.  Others within the department also noticed a change in the relationship between plaintiff and Nazon.[1]  Nazon excluded plaintiff and instead worked directly with his direct reports.  According to plaintiff, the work that he had been praised for in the past was no longer good enough for Nazon, and he described her criticism of his work as "gaslighting."  Nazon had a two-hour session with plaintiff which was part of a review of his performance.  Then she scheduled additional follow-up meetings for his annual review, which ended up totaling a combined seven hours to discuss his performance.  According to plaintiff, Nazon presented him with new

---

[1]Justin Winget (a white male), Nikia Reveal (a white female), and Brian Aubert (a white male) all testified that they observed that the relationship between plaintiff and Nazon was initially good but then it soured over time.  However, Winget, Reveal, and Aubert also experienced a negative relationship with Nazon at some point in their tenure with OSU.

performance expectations but gave him no authority to make changes.   In plaintiff's opinion, Nazon set him up to fail.  (*See* Plaintiff's Exhibit 19; Defendant's Exhibit PP.)

{¶11} In late April 2017, Nazon scheduled a one-on-one meeting with plaintiff at a Panera Bread restaurant.   During the meeting, Nazon was extremely critical of his performance, and, in his opinion, she fabricated performance deficiencies and falsely suggested that he was not meeting her expectations in his role.   (Defendant's Exhibit VV.)  On May 1, 2017, plaintiff met with Nazon again and presented her with a written response to her criticism.  (Plaintiff's Exhibit 23.)

{¶12} After plaintiff had presented his response, Nazon told him that she had been doing a lot of thinking and that she believed that he was "not the right fit."  Nazon stated that she needed to go in a different direction and asked plaintiff to resign. Plaintiff was upset.  Plaintiff asked whether there was another position that he could be placed in, but there was no other option.   Nazon announced plaintiff's resignation on May 10, 2017.  (Plaintiff's Exhibit 26.)   Later, plaintiff underwent an exit interview. (Plaintiff's Exhibit 27.)

{¶13} Plaintiff admitted that Nazon had the authority to decide that his employment was not the right fit at any time.  Plaintiff was an employee-at-will, and his position as the sole, Senior Associate VP had increased risk and uncertainty.  Plaintiff acknowledged that it was important to have leadership alignment with Nazon, and that if she determined that he did not support her approach of the matrix organization, she could decide to change direction because she was his boss.  Plaintiff admitted that he did not complain about discrimination based upon either gender or race in his exit interview, his ethics point complaint, or at any time during his employment.  Plaintiff acknowledged that Holly Means, a white female, replaced him.

{¶14} Justin Fincher (a white male), Associate Vice President in Advancement, served on the search committee that ultimately selected Nazon.  Additionally, Fincher worked with Nazon to select plaintiff for the number two position under her.  In the fall of

2016, when plaintiff was creating his goals for the year, Nazon approached Fincher to discuss concerns she was having with plaintiff.  Fincher advised that Nazon document any issues with plaintiff's performance.  According to Fincher, Nazon and plaintiff had very different styles.  During the mid-year performance review, Nazon informed Fincher that plaintiff was not meeting the goals that someone in his position should, but Nazon opted not to put plaintiff on a formal improvement plan.

{¶15} Fincher further testified that it was Nazon's decision to ask plaintiff to resign.  According to Fincher, plaintiff did not raise issues of gender or race discrimination with him either during or after his employment.  Fincher testified that Nazon did not need anyone's approval to hire or fire plaintiff.  Fincher acknowledged that Nazon contributed to the cultural issues at OSU; however, Fincher also testified that plaintiff, as a senior leader, was not meeting benchmarks against the strategic plan and he was not solving the cultural issues.  By October 2016, Fincher believed that plaintiff was not meeting Nazon's expectations.

{¶16} Adrienne Nazon testified that she is currently the Vice President of Marketing Advancement at OSU.  According to Nazon, her role was new for OSU.  The role was to perform strategic branding and marketing in a modern concept.  Nazon knew that her role and the idea of marketing for the entire university would be a significant shift and a major change for current employees who were accustomed to former ways of doing business.  Nazon was aware that certain employees would not welcome the change.

{¶17} According to Nazon, it initially seemed like plaintiff would be a good fit for a number two position.  In July 2016, Nazon praised plaintiff's work and rated him as "excels" in every category during his performance review at the end of the fiscal year.  (Defendant's Exhibit W.)  Nazon and plaintiff had many discussions about plaintiff's responsibilities to support the AVPs who had less experience, to grow the culture, and move things forward.  Additionally, in October 2016, Nazon identified six goals for

plaintiff.   (Defendant's Exhibit FF.)   When plaintiff had concerns about the matrix organization, Nazon asked him to invest in how matrix organizations work.   Nazon stated that alignment between herself and plaintiff was important.

{¶18} In late 2016, plaintiff approached Nazon to discuss the leadership team. According to Nazon, plaintiff was concerned that Winget and Bailey-Harris were not performing well in their AVP roles.   However, Nazon's impression of Bailey-Harris, specifically, was very good.   Nevertheless, plaintiff expressed that he wanted to have both Bailey-Harris' and Winget's direct reports report to him instead.   Additionally, plaintiff indicated he was still concerned about the matrix structure and wanted to restructure it.

{¶19} In February 2017, Nazon conducted a mid-year review of plaintiff. (Defendant's Exhibits PP, QQ.)   Nazon discussed with Jason Barnett from Human Resources regarding her concern that plaintiff was not able to handle what she wanted from the number two position.   At one point, plaintiff remarked to Nazon that the position was "not what [he] signed up for."   Nazon testified that she and Barnett drafted a document that would serve as an improvement plan for plaintiff to address the concerns she had with his performance.  (Defendant's Exhibit SS).   However, Nazon ultimately concluded that plaintiff was not the right fit for the position.

{¶20} On May 1, 2017, Nazon informed plaintiff that she needed to go in a different direction and asked for his resignation.   Nazon testified that she did not base her decision on plaintiff's race or gender.   Nazon later hired Holly Means, a white female, to replace plaintiff.   Nazon stated that plaintiff would often break ranks with her, which added to the cultural issues within the department.   Nazon expected plaintiff to solve any cultural issues within the department before they were brought to her.   Nazon acknowledged that plaintiff was meeting her expectations in the summer of 2016 by helping her hire the AVPs.   However, her opinion of plaintiff's performance began to change in the fall once she realized they were not making progress as a team.

**Plaintiff's First Objection**

{¶21} In his first objection, plaintiff argues that he was comparable to Bailey-Harris.[2]  Plaintiff argues that, because he had no direct authority over Bailey-Harris and both he and Bailey-Harris directly reported to Nazon, Bailey-Harris is a similarly situation employee to him.  Plaintiff also points out that because Bailey-Harris had more direct reports than he did, Baily-Harris held more responsibility than him.  Plaintiff asserts that he and Bailey-Harris were peers and thus similarly situated for the purposes of proving his claim of reverse-race discrimination.

{¶22} In claims of reverse discrimination, the plaintiff bears the burden of demonstrating that his employer intentionally discriminated against him despite his majority status, and courts have altered the elements of the prima facie case of discrimination to reflect the unique nature of the claim.  *Mowery v. Columbus*, 10th Dist. Franklin No. 05AP-266, 2006-Ohio-1153, ¶ 44.  Therefore, in order to establish a prima facie case of reverse race discrimination, plaintiff must show that (1) the background circumstances support the inference that defendant was the unusual employer who discriminated against non-minority employees, (2) defendant took an action adverse to plaintiff's employment, (3) plaintiff was qualified for the position, and (4) defendant treated plaintiff disparately from similarly situated minority employees.  *Id.*  "To be deemed 'similarly situated', the comparables 'must have dealt with the same supervisor, have been subjected to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Tilley v. Dublin,* 10th Dist. Franklin

---

[2]In his first objection, plaintiff also argued that he was comparable to Nick Love, a black male employee, who plaintiff assisted Nazon in hiring as Senior Director of Social Media during the same time the other three AVPs were hired.  However, this court already determined in its ruling on defendant's motion for summary judgment that Love was not a comparable employee to plaintiff. *See* Entry Ruling on Partial Motion for Summary Judgment at p. 12.  Consequently, it will not consider plaintiff's objection as it relates to Love.

No. 12AP-998, 2013-Ohio-4930, ¶ 34 (internal citations omitted). "Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated." *Campbell v. Hamilton County*, 23 F.App'x 318, 325 (6th Cir.2001).

{¶23} It is undisputed that plaintiff had over 20 years of experience and was hired as a Senior AVP, a position that both Nazon and plaintiff considered to be the number two position in the marketing department. It is also undisputed that plaintiff was the only individual employed as a Senior AVP, and he was paid a significantly higher annual salary than the non-senior AVPs.

{¶24} Although plaintiff asserts that he had no direct supervision over Bailey-Harris or any of the other AVPs, the evidence shows that plaintiff's responsibilities within the department differed from those of Bailey-Harris. In addition to assisting Nazon in hiring employees, including Bailey-Harris and the other AVPs, plaintiff also assisted Nazon in overseeing OSU's marketing department as a whole. Furthermore, part of plaintiff's responsibilities included ensuring that employees within the marketing department were aligned with Nazon's overall vision for the department. Additionally, plaintiff acted as a point of communication between Nazon and other employees regarding issues within the department.

{¶25} Nazon hired plaintiff due to his deep understanding of the workings of the university, and she expected plaintiff to assist her in navigating the university in the early stages of their relationship. Nazon also expected plaintiff to resolve issues within the marketing department before those issues would be presented to her. There is no evidence to suggest that Bailey-Harris had any authority over plaintiff, nor did she have any authority over the marketing department as a whole. There is also no evidence to suggest that Bailey-Harris had the same responsibilities as plaintiff. Upon review of the record, the court finds that the magistrate did not err in concluding that Bailey-Harris

was not a valid comparator to plaintiff. Accordingly, the court overrules plaintiff's first objection.

**Plaintiff's Second Objection**

{¶26} In his second objection, plaintiff argues that the magistrate erred in concluding that Nazon would have made the decision to terminate plaintiff absent any impermissible motive on her part. Plaintiff argues that the reason he was fired was because he criticized the matrix reporting structure and Bailey-Harris' role within that structure. Plaintiff further argues that his criticism of Bailey-Harris, not his performance, was the real reason for his termination. Rather, plaintiff argues, the evidence shows that plaintiff was meeting Nazon's expectations up until he criticized Bailey-Harris' role within the matrix structure. Plaintiff also asserts that Nazon was aware of the issues with Bailey-Harris, and yet, she never terminated her.

{¶27} "'To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent' and may establish such intent through either direct or indirect methods of proof." *Dautartas v. Abbott Labs.*, 10th Dist. Franklin No. 11AP-706, 2012-Ohio-1709, ¶ 25, quoting *Ricker v. John Deere Ins.* Co., 133 Ohio App.3d 759, 766, 729 N.E.2d 1202 (10th Dist.1998). In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

### A. Direct method of proof

{¶28} "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). Direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part

by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003).

{¶29} In his objections, plaintiff does not point to any comments or other evidence that he believes constitutes direct evidence of discrimination.[3] Rather, he focuses on the preferential treatment of Bailey-Harris exhibited by Nazon, which would potentially constitute indirect evidence of discrimination. Accordingly, the court does not find plaintiff's objection well taken as it relates to Nazon's preferential treatment of Bailey-Harris constituting direct evidence of discrimination.

## B. Indirect method of proof

{¶30} Turning to plaintiff's argument regarding indirect evidence, the court finds that the magistrate did not err in concluding that Nazon would have terminated plaintiff regardless of any impermissible bias. Proving discriminatory intent through indirect evidence is subject to the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Nist v. Nexeo Solutions, LLC*, 10th Dist. Franklin No. 14AP-854, 2015-Ohio-3363, ¶ 31.

{¶31} "Under *McDonnell Douglas*, a plaintiff must first present evidence from which a reasonable jury could conclude that there exists a prima facie case of discrimination." *Turner v. Shahed Ents.*, 10th Dist. Franklin No. 10AP-892, 2011-Ohio-4654, ¶ 11-12. "If the plaintiff meets her initial burden, the burden then shifts to the defendant to offer 'evidence of a legitimate, nondiscriminatory reason for' the adverse action. * * * If the defendant meets its burden, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason was actually a pretext for unlawful discrimination." *Id.* at ¶ 14. "The ultimate burden of persuasion always remains with the

---

[3]Although there was testimony at trial regarding a statement made by Nazon that plaintiff was a "tall white man," the magistrate concluded that because the statement was made while discussing plaintiff's strengths, it did not constitute direct evidence of discrimination. Furthermore, plaintiff does not mention the "tall white man" comment anywhere in his objections.

plaintiff. * * * In order to show pretext, a plaintiff must show both that the reason was false, and that discrimination was the real reason." *Ames v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4774, 23 N.E.3d 162, ¶ 27 (10th Dist.).

{¶32} A plaintiff can establish pretext by demonstrating that the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's conduct, or (3) was insufficient to warrant the challenged conduct. *Pla v. Cleveland State University*, 10th Dist. Franklin No. 16AP-366, 2016-Ohio-8165, ¶ 22. As a general rule, the court will not substitute its judgment for that of the employer and will not second-guess the business judgment of employers regarding personnel decisions. *Kirsch v. Bowling Green State Univ.,* 10th Dist. Franklin No. 95API11-1476, 1996 Ohio App. LEXIS 2247 (May 30, 1996). Additionally, in a discrimination case, the court must examine the employer's motivation, not a plaintiff's perceptions. *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir.1987).

{¶33} Plaintiff argues that the actual reason he was fired was because he criticized Bailey-Harris' role within the matrix reporting structure. Plaintiff also argues that, unlike Bailey-Harris who was afforded ample opportunities to improve her performance issues, plaintiff was never placed on an improvement plan. Upon review, the court finds, which the magistrate properly noted, that Nazon did show favoritism towards Bailey-Harris. Additionally, it is undisputed that Nazon and Bailey-Harris had an established working relationship prior to their tenure at OSU.

{¶34} However, the evidence also reveals that Nazon began documenting plaintiff's performance deficiencies beginning in the fall of 2016 and into the spring of 2017. Nazon described her issues with plaintiff, including that Nazon perceived plaintiff's tendency to break ranks with her as a misalignment between herself and her number two in command. This is also supported by Fincher's testimony, who stated that, by October 2016, he believed plaintiff was not meeting Nazon's expectations.

{¶35} Furthermore, plaintiff admitted that being aligned with Nazon was critical to his success as the number two in the marketing department.  It is also undisputed that Nazon alone made the decision to hire plaintiff in the number two position.  Moreover, plaintiff acknowledged that the position came with an inherent risk that Nazon could fire him at any time if things were not working out.  Additionally, plaintiff testified that when he confronted Nazon, he was very direct with her and he admitted he believed he lost his job after the meeting.  However, plaintiff never complained of race or gender discrimination at any point in his employment with OSU's marketing department.

{¶36} Although there is evidence to suggest Nazon showed favoritism towards Bailey-Harris, there is also sufficient evidence that plaintiff was not meeting Nazon's expectations by October of 2016.  Furthermore, as discussed above, plaintiff is not a comparable employee to Bailey-Harris, as he was the only employee in the number two position and was paid considerably more than any other AVP.  Accordingly, the court finds that the magistrate did not err in concluding that Nazon would have made the same decision to terminate plaintiff absent impermissible bias as it is evident that, once Nazon determined plaintiff was not aligned with her vision, she made the decision to terminate him.  Therefore, the court overrules plaintiff's second objection.

**Conclusion**

{¶37} The court finds that the magistrate properly determined the factual issues and appropriately applied the law in this case.  Therefore, plaintiff's objections shall be overruled.  The court shall adopt the magistrate's decision and recommendation as its own, including all findings of fact and conclusions of law.  Judgment shall be rendered in favor of defendant.

PATRICK M. MCGRATH
Judge

[Cite as *McGinty v. Ohio State Univ.*, 2020-Ohio-4315.]

| PETER MCGINTY | Case No. 2018-00026JD |
|---|---|
| Plaintiff | Judge Patrick M. McGrath<br>Magistrate Holly True Shaver |
| v. | |
| | <u>JUDGMENT ENTRY</u> |
| THE OHIO STATE UNIVERSITY | |
| Defendant | |

{¶38} Upon review of the record, the magistrate's decision and the objections, the court finds that the magistrate has properly determined the factual issues and appropriately applied the law. Therefore, the objections are OVERRULED and the court adopts the magistrate's decision and recommendation as its own, including findings of fact and conclusions of law contained therein. Judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

PATRICK M. MCGRATH
Judge

Filed July 29, 2020
Sent to S.C. Reporter 9/3/20