DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Eva Coch, appeals from a judgment by the Lucas County Court of Common Pleas granting summary judgment in favor of appellee GEM Industrial, Inc. ("GEM"). For the reasons that follow, we affirm.
 {¶ 2} Appellant Coch is a journeyman electrician and a member of IBEW Local 8. GEM is a signatory to a collective bargaining unit with Local 8. When GEM is in need of electricians, it contacts the IBEW Local 8 for assignments to fill that need. The assignments are made pursuant to the union's referral procedures. It was in Coch's capacity as journeyman-union member that she first became employed by GEM, in 1999. She remained with GEM, working on various jobs, until March 2001, when she was laid off.
 {¶ 3} Kris Cousino, who was GEM's superintendent of electricians and Coch's supervisor, testified at deposition about the process of moving electricians among jobs. He stated that when a job is winding down, the foreman of the job contacts Cousino to tell him that he will need to lay off electricians. If fewer than all of the electricians are to be released, Cousino consults with the foreman to help him decide who should be let go and who should remain. Cousino then contacts GEM's other project managers to determine whether they need electricians or will need them soon. If Cousino finds places for the electricians from the job that is winding down, he transfers them to the new positions. If he is unable to place an electrician, he lays the electrician off. The electrician will then return to the union hall for reassignment to a different employer.
 {¶ 4} In early to mid-2000, Coch injured her back while working for GEM. Coch claims that because she was unable to work without restrictions, GEM — through Cousino — assigned her to a light duty position in its shop. Coch testified that when she was first assigned to the shop, there was no work for her to do, so she spent her time reading the paper. Thereafter, she performed such tasks as sorting and filing, taking vehicles to repair shops and working on bids.
 {¶ 5} Cousino then assigned Coch to a job at a company named Fresenius. The job was a small one, and Cousino assigned an apprentice to help Coch with any work that she was physically unable to do. The Fresenius job ended in November 2000.
 {¶ 6} After the Fresenius job, Coch was sent to several other GEM sites. Ultimately, she was assigned to a job at GEM site Crown Cork 
Seal ("CCS"). She began work at CCS during the week ending February 25, 2001, and stayed until her layoff on March 16, 2001. The foreman on that job was Mike Linenkugel.
 {¶ 7} On March 5, 2001, GEM assigned electrician Robert Beene to the job. Beene is an African American. Coch and Beene had known each other for several years. Beene had suffered injuries to both shoulders and to his neck during his approximately five-year tenure at GEM, and prior to the layoff had undergone four surgeries. At the time of his CSS job, Beene was no longer under any restrictions.
 {¶ 8} Coch alleges that at some point during her assignment at CCS she had a conversation with Beene about light-duty work. She states that she had not seen him in a while, and asked him where he had been. Beene told her that he had been off of work due to injury and, as a result, had lost his health insurance. Coch told Beene that she and other GEM employees — including Rob Quiroga, Dan Kolar and a traveler named Sid — had been given light duty at the shop during periods when they were injured, and asked him why he had not done the same. Beene answered that such work was never offered to him. Coch cannot recall whether race was discussed in that conversation.
 {¶ 9} Beene recounts a slightly different version of the light-duty dialogue between himself and Coch, stating that there was not just one conversation, but rather a series of conversations, concerning the subject of light duty work. According to Beene, during the series of conversations with Coch, he asked her when she was off of work, how often she had been on light duty, and whether she knew of anyone else who had been given light duty work in the shop. Coch identified Quiroga and other individuals whose names Beene could not remember. According to Beene, all of the individuals who got light duty were white, with the possible exception of Quiroga, whom Beene believed to be "Mexican".
 {¶ 10} Beene told Coch that he wanted to talk to Cousino to find out why he had not been given light duty. Although Beene testified that he probably brought up the subject of race during this series of conversations with Coch, he cannot specifically recall any such discussion.
 {¶ 11} Following the conversation or conversations with Coch, Beene approached Cousino and asked him why he had not been given an opportunity to work light duty like the others had. Beene cannot remember Cousino's response, but he does remember that, whatever the response was, he was not satisfied with it.
 {¶ 12} Cousino agrees that Beene asked him about why he had assigned light duty work in the shop to Coch but not to Beene. According to Cousino, he explained to Beene that Beene's situation differed from Coch's because GEM could prevent Coch's injury from becoming a "lost time" injury by keeping her working. Beene's injury, on the other hand, was more extensive than Coch's, and involved a longer period of time. Beene had undergone several surgeries that rendered him unable to work at all, so his injury was already a "lost time" injury. That being the case, there was no benefit to GEM in putting Beene to work in the shop.
 {¶ 13} It is undisputed that Beene did not mention race in the conversation with Cousino.
 {¶ 14} On March 16, 2001, just days after Beene's conversation with Cousino, both Beene and Coch were laid off. Linenkugel, the job foreman, informed Cousino that he needed to cut back his crew because the job was winding down and there was not enough work. Cousino made the decision as to which crew members would be laid off. Cousino testified that although he had no specific recollection of the Coch and Beene layoffs, he would have followed his typical procedure, including calling other project managers to determine whether there was a place to transfer electricians, and upon hearing that there was not, making the decision to institute layoffs.
 {¶ 15} Although Coch and Beene deny any knowledge that the job at CCS was concluding, GEM's business records, together with uncontroverted testimony by Robert Pruger, Chief Financial Officer and Treasurer for The Rudolph/Libbe Companies, Inc.,[1] clearly demonstrate that the number of hours charged by electricians to the CCS job steadily declined from the week ending March 11, 2001, the week prior to Coch's layoff. These records further demonstrate that the number of hours charged to the job code on which Coch and Beene were working decreased by more than half from the week ending March 11, 2001 to the week ending March 18, 2001, which was the week of Coch's layoff, and that they decreased to almost nothing after Beene and Coch were laid off.
 {¶ 16} It is undisputed that at the same time that the CCS job was winding down in March 2001, GEM's company-wide need for electricians was also on the downswing. According to Pruger, a review of GEM's business records revealed that in 2001, electrical work was decreasing. Using the year 2000 as a base, GEM's Local 8 electrician hours declined in 2001 in excess of 67,000 hours, a 16.9 percent reduction from the year 2000. That decline continued through the years 2002 and 2003. In 2003, GEM's Local 8 electrician hours were down over 224,000 hours from where they were in the year 2000, marking a 56.5 percent decline.
 {¶ 17} Following his layoff from GEM, Beene filed a charge with the Ohio Civil Rights Commission in which he alleged race discrimination, but not retaliation. That charge was ultimately settled.
 {¶ 18} On December 16, 2002, Coch filed a claim for retaliation, alleging that she was laid off for having supplied Beene with information regarding similarly situated white workers who were given light duty employment where Beene was not. GEM filed a motion for summary judgment. In a judgment entry dated November 10, 2004, the trial court granted summary judgment in favor of GEM, on the grounds that Coch failed to demonstrate that she had engaged in protected activity pursuant to R.C.4112.02(I). Coch timely appealed the trial court's judgment entry, raising the following as her sole assignment of error: "The trial court erred by granting summary judgment to the defendant-appellee. See judgment entry filed November 10, 2004, journalized November 12, 2004. (attached here.)"
 Summary judgment standard. {¶ 19} An appellate court reviewing a trial court's granting of summary judgment does so de novo, applying the same standard used by the trial court. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. Civ.R. 56(C) provides:
 {¶ 20} "* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as considered in this rule. * * *"
 {¶ 21} Summary judgment is proper where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) when the evidence is viewed most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, a conclusion adverse to the nonmoving party. Rybergv. Allstate Ins. Co. (July 12, 2001), 10th Dist. No. 00AP-1243, citingTokles Son, Inc. v. Midwestern Indemnity Co. (1992), 65 Ohio St.3d 621,629.
 {¶ 22} The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of fact as to an essential element of one or more of the nonmoving party's claims.Dresher v. Burt (1996), 75 Ohio St.3d 280, 292. Once this burden has been satisfied, the non-moving party has the burden, as set forth at Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id.
Whether summary judgment was appropriate with respect to Coch'sretaliation claim.
 {¶ 23} Coch asserts that the trial court erred in granting summary judgment in favor of GEM on her retaliation claim, because it improperly concluded that she had not engaged in protected activity under R.C.4112.02(I).
 {¶ 24} R.C. 4112.02 (A) forbids an employer "to discharge without just cause * * * or otherwise to discriminate against [any] person with regard to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment" on the basis of race.
 {¶ 25} R.C. 4112.02(I) provides that it is an unlawful discriminatory practice:
 {¶ 26} "(I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07
of the Revised Code."
 {¶ 27} To establish a retaliation claim, a plaintiff must demonstrate: (1) that she engaged in a protected activity; (2) that the defendant knew that she had engaged in a protected activity; (3) that the defendant took an adverse employment action against her; and (4) that there is a causal link between the protected activity and the adverse employment action. Edwards v. Dubruiel, 2d Dist No. 2002 CA 50, 2002-Ohio-7093, at ¶ 39, citing Nguyen v. City of Cleveland (C.A. 6, 2000), 229 F.3d 559, 563 and Peterson v. Buckeye Casings (1999),133 Ohio App.3d 715, 727. Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a legitimate reason for its action. Id. If the defendant meets its burden, the burden shifts back to the plaintiff to show that the articulated reason was merely pretextual. Id.; see also, McDonnell Douglas Corp. v. Green
(1973), 411 U.S. 792, 802-804.
 1. Whether Coch engaged in protected activity. {¶ 28} In the instant case, the trial court determined that because there was no evidence to suggest that Coch's conversation with Beene regarding the light-duty assignments involved any mention of race, and because the conversation did not constitute participation in an investigation, proceeding, or hearing, it was not a protected activity.
 {¶ 29} As indicated above, R.C. 4112.02(I) prohibits discrimination in two situations: (1) where an employee has opposed any unlawful discriminatory practice, the "opposition clause"; and (2) where an employee has made a charge, testified, assisted or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01
to 4112.07 of the Revised Code, the "participation clause". The distinction between the opposition and the participation clauses is significant because courts have generally granted less protection for opposition activities than for participation in enforcement proceedings.Booker v. Brown Williamson Tobacco Co. (C.A. 6, 1989), 879 F.2d 1304,1312.[2] While the participation clause accords "exceptionally broad protection" to persons who have "participated in any manner," the opposition clause does not protect all "opposition activity." Id.; see also, Holden v. Owens-Illinois, Inc. 793 F.2d 745, 751 (6th Cir. 1986).
 {¶ 30} To determine whether an activity engaged in by the employee falls within the "participation" clause or the "opposition" clause requires a literal reading of the statute. Id., at 313. As stated above, R.C. 4112.02(I) provides protection to an employee who "participated in any manner in any investigation, proceeding, or hearing under sections4112.01 to 4112.07 of the Revised Code." (Emphasis added.) Thus, a prerequisite to protection under the participation clause is the initiation of formal proceedings leading to the filing of a complaint or a charge; if the activity engaged in by the employee occurs prior to the initiation of statutory proceedings it is to be considered pursuant to the opposition clause. See id. at 313.
 {¶ 31} In the instant case, the conversation or conversations during which Coch notified Beene about others who had received light-duty employment occurred before Beene filed his discrimination charge. Therefore, those conversations are to be considered pursuant to the opposition clause, and not the participation clause.
 {¶ 32} "In order to engage in a protected opposition activity * * * a plaintiff must make an overt stand against suspected illegal discriminatory action." Comiskey v. Automotive Industry Action Group
(E.D.Mich. 1999), 40 F.Supp.2d 877, 898; see also Jackson v. ChampionNatl. Bank Trust Co. (Sept. 26, 2000), 10th Dist. No. 00AP-170. Vague charges of discrimination do not invoke the protection of the law.Booker, supra, at 1313. In addition, "[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are [likewise] insufficient to constitute protected activity." Weaver v. OhioState Univ. (S.D. Ohio 1998), 71 F.Supp.2d 789, 793-94.
 {¶ 33} Here, the evidence is undisputed that Coch's conversation or conversations with Beene were simply about employees who had been on light duty in GEM's shop; the issue of race was never discussed. Nor was race mentioned in Beene's conversation with Cousino: Beene claims only that he "inferred" race "in a roundabout way," hoping that Cousino would draw the conclusion that Beene was making a race complaint — simply because he was an African-American mentioning Caucasian employees. In our opinion, neither Coch's conversation or conversations with Beene nor Beene's conversation with Cousino rises to the level of an "overt stand." See, Jackson, supra. In fact, none of the alleged conversations amounts to more than a vague charge of discrimination, such as was rejected by the court in Booker. On the basis of the foregoing, we find that Coch has failed to demonstrate that she engaged in protected activity.
 {¶ 34} Summary judgment is properly granted on these grounds alone. Nevertheless, we will address the remaining elements of Coch's claim.
 2. Whether Coch can show that GEM knew she had engaged in protected activity. {¶ 35} Assuming, arguendo, that Coch did engage in protected activity, we must then consider whether she can show that GEM had sufficient knowledge of that activity so as to satisfy her burden under the second prong of the prima facie case. The record clearly demonstrates that GEM got its knowledge of Coch's activity during Cousino's conversation with Beene, when Beene inquired as to why he did not get light duty in the shop when other employees did. It was at that time that Beene made the disclosure to Cousino that Coch had told him about the others. As indicated above, however, there was never any mention made of race. Beene merely "inferred" race "in a roundabout way," hoping that Cousino would understand it to be a race complaint. Cousino's undisputed testimony reveals that, in fact, he had no understanding that Beene was complaining of race discrimination.
 {¶ 36} Coch argues that Cousino "undoubtedly realized" that the complaint was racial. By this argument, Coch implies that Cousino's knowledge of the racial aspect can be inferred from the record. We are not persuaded by this argument. The record in this case unequivocally demonstrates that Cousino reasonably believed that the conversation was merely one in which an employee was questioning why he was not assigned light duty work in the shop. If, as appears clear from the record, Cousino did not understand Beene's complaint to be about race discrimination, then he could not possibly have understood Coch's disclosure to Beene to have been about such. Accordingly, we find that Coch has failed to establish the second prong of her prima facie case of retaliation.
 {¶ 37} Arguing against this conclusion, Coch claims that the second prong of the test does not require a showing that GEM knew the complaint to be racial in nature. Instead, Coch argues, it is sufficient that GEM knew that Coch provided the information which (later) formed the basis of Beene's complaint. We disagree with Coch's interpretation of the test.
 {¶ 38} As stated above, the second prong requires a showing that the defendant knew that she had engaged in a protected activity. If the requirement does not include knowledge of any racial aspect of Coch's activity, it becomes essentially meaningless, adding nothing to the prima facie test. In our opinion, such a reading of the requirement would inappropriately diminish Coch's burden.
 3. Whether GEM took an adverse employment action against Coch. {¶ 39} It is undisputed that Coch was laid off by GEM and that such action constituted an adverse employment action against Coch. Thus, Coch has satisfied the third prong of the prima facie test.
Whether Coch can demonstrate the existence of a causal connectionbetween the protected activity and the adverse employment action.
 {¶ 40} We next consider whether Coch has adequately demonstrated the existence of a causal connection between her conversation or conversations with Beene and her layoff. It is undisputed that Coch and Beene were laid off just days after their exchanges regarding light duty work. However, temporal proximity does not support a claim of retaliation absent other compelling evidence. Boggs v. The Scotts Co., 10th Dist. No. 04AP-425, 2005-Ohio-1264, at ¶ 26.
 {¶ 41} Even if it could properly be inferred that the layoffs occurred as a result of the Beene/Coch and Beene/Cousino conversations concerning light duty, GEM has articulated a legitimate reason for its action: it was made pursuant to a reduction in force due to a decreasing workload. See Edwards v. Dubruiel, 2d Dist No. 2002 CA 50, 2002-Ohio-7093, at ¶ 39.
 {¶ 42} Because GEM has met its burden, the burden shifts back to Coch to show that the articulated reason was merely pretextual. Id. Coch has not presented any evidence showing that the reduction in force was a pretext. Accordingly, we find that Coch has failed to establish the fourth prong of her prima facie case.
 {¶ 43} For all of the foregoing reasons, appellant's assignment of error is found not well-taken. Accordingly, we affirm the judgment of the trial court. Pursuant to App.R. 24, costs are assessed to the appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Skow, J., Concur.
[1] The Rudolph/Libbe Companies Inc. is a holding company for, among others, GEM Industrial, Inc.
[2] When interpreting alleged violations of R.C. Chapter 4112, Ohio courts frequently rely on federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq. Title 42, U.S.C. Code. See Plumbers Steamfitters Joint Apprenticeship Comm. v. Ohio CivilRights Comm. (1981), 66 Ohio St.2d 192, 196; see also, Edwards v.Dubruiel, supra, at ¶ 38.