[Cite as *Asea v. Univ. of Toledo College of Med.*, 2024-Ohio-4572.]

## IN THE COURT OF CLAIMS OF OHIO

| | |
|---|---|
| DR. ALEXZANDER ASEA, et al.<br><br>Plaintiffs<br><br>v.<br><br>UNIVERSITY OF TOLEDO COLLEGE OF MEDICINE<br><br>Defendant | Case No. 2021-00686JD<br><br>Magistrate Gary Peterson<br><br>DECISION OF THE MAGISTRATE |

{¶1} This case was tried to the magistrate on the issues of liability and damages. The court previously granted summary judgment on counts 6 through 9 of plaintiffs' amended complaint as well as on defendant's counter claim. Accordingly, the only claims that remain are claims for discrimination and retaliation listed as counts 1-5 of the amended complaint. For the reasons that follow, it is recommended that judgment be entered in favor of defendant.

**Findings of Fact**

{¶2} Plaintiff, Dr. Alexander Asea (Asea), is a black man born in Uganda, Africa. Plaintiff, Dr. Punit Kaur (Kaur), is a South Asian woman born in India. Asea and Kaur both received PhDs prior to beginning employment at the University of Toledo College of Medicine (UTMC). Asea and Kaur were recruited, at least in part by John Nemunaitis, formerly Chief of the Division of Hematology/Oncology, to join the faculty at UTMC. On January 10, 2018, UTMC sent Asea an offer letter for a faculty appointment in the College of Medicine and Life Sciences, Department of Medicine at the University of Toledo, at the rank of Professor. Plaintiff's Exhibit 1. Asea's appointment was for 12 months at an annual salary of $200,000. *Id.* The offer letter stated that "You will be expected to cover a minimum of 25% of your salary and fringe benefits from extramural grants after your first year. The College of Medicine and Life Sciences will fund 100% of your salary the

first year and up to 75% thereafter." *Id*. UTMC also provided Asea with startup funds and purchased equipment so that Asea could establish a research lab.

{¶3} On April 3, 2018, UTMC offered Kaur a faculty appointment in the College of Medicine and Life Sciences, Department of Medicine at the University of Toledo, at the rank of Associate Professor, subject to review and approval by the Appointment, Promotions, and Tenure Committee and final approval by the Board of Trustees. Plaintiff's Exhibit 2. Kaur's appointment was for 12 months with an annual salary of $120,000. *Id*. The offer letter stated: "You will be expected to cover a minimum of 25% of your salary and fringe benefits from extramural grants after your first year. The College of Medicine and Life Sciences will fund 100% of your salary the first year and up to 75% thereafter." *Id*.

{¶4} The Appointment, Promotions and Tenure Committee (APT) reviews, endorses, and makes recommendations for appointments for someone coming to the university, for promotion of faculty, and recommendations regarding promotion to tenured status. Dr. Christopher Cooper (Cooper), Dean of the College of Medicine and Life Sciences and Vice Provost along with the APT review and make recommendations to the Provost regarding faculty appointments. Cooper oversees approximately 500-1,000 employees and did not have regular interaction with Asea or Kaur. Cooper explained that the APT, after review, determined that Kaur should be awarded the rank of Assistant Professor rather than Associate Professor. Cooper agreed with that recommendation. Regarding Asea, Cooper added that the APT did not agree to appoint Asea as a full professor, but he nevertheless received that rank as there is a policy not to demote someone who joins the university.

{¶5} Asea began working at UTMC on February 1, 2018, and was reappointed for a 12-month term beginning July 1, 2018, and ending June 30, 2019. Defendant's Exhibit J. Kaur received an appointment letter for a term beginning May 1, 2018, and ending June 30, 2019. Defendant's Exhibit GG. Both Asea and Kaur were placed on the Academic Basic Scientist Track, which is a research heavy track with the tangible products being publications in national peer-reviewed periodicals and extramural grant support with the most impactful academically being grant support from the National Institute of Health (NIH). Defendant's Exhibits GG and J. Cooper credibly testified that

the Academic Basic Scientist Track was the most appropriate track for both Asea and Kaur as they would not have qualified for clinical tracks and the research track would have required 100% grant support. Cooper also credibly added that Kaur was not qualified for the teaching track. Thus, despite Kaur's desire to switch tracks, the Academic Basic Scientist Track was the appropriate track.

{¶6} At some point while Plaintiffs were employed at UTMC, Nemunaitis commented during a meeting something to the effect of "you must be having a bad day" to Kaur. Kaur, who viewed the comment to be sexist in nature, reported this comment to several individuals at UTMC, including the Title IX Office. Ultimately, Kaur did not file a formal complaint as Nemunaitis resigned on February 5, 2020.

{¶7} On May 10, 2019, Lance Dworkin, who was formerly and at all times relevant to this case the Chair of the Department of Medicine, sent an email to Asea intended to make it clear what the expectation was regarding generating extramural grant funding because in Dworkin's view, there was very little production coming out of the lab. Defendant's Exhibit K. The letter provides as follows:

> "You [Asea] and Dr. Kaur need to publish and apply for and obtain extramural funding this year in order to demonstrate the value of your program to the institution. I appreciate your desire to generate some revenue but, although you might be able to make money peddling your expertise to industry, unless you are intellectually and substantively involved in the research, performing assays for industry is just a distraction. That is not what you were recruited to do. It is not why we have invested and am supporting your research program. You are faculty, not an independent for profit core lab. Your number one goal is academic productivity. Success or failure in that arena is based on publications, obtaining nationally competitive, extramural grant support, and innovation and patents, not industry contacts. Those are the metrics upon which your program will be judged. Anything else hardly matters."
> *Id.*

{¶8} Asea was reappointed for another 12-month term beginning July 1, 2019, and ending June 30, 2020. Defendant's Exhibit L. Kaur was also reappointed for another 12-month term beginning July 1, 2019, through June 30, 2020. Defendant's Exhibit II.

{¶9} On December 3, 2019, UTMC sent Asea and Kaur a letter informing them that their faculty appointments will not be renewed after June 30, 2020. Defendant's Exhibits LL and N. Cooper explained that the reason for the nonrenewal of their faculty appointments was the lack of research productivity based on discussions with Dworkin. Cooper further agreed that they were to be given an extension to allow them to obtain the necessary extramural funding as they had several pending grant applications and that rarely does UTMC provide for such an extension. Asea and Kaur subsequently received reappointment letters for July 1, 2020, through September 30, 2020, effectively a three-month extension. Their salaries were also decreased at that time. Defendant's Exhibits MM and R. Plaintiffs' salaries were previously decreased as part of a university-wide reduction due to the Covid-19 pandemic. Plaintiffs' last day of employment at UTMC was September 30, 2020, as plaintiffs failed to obtain the necessary extramural grant support.

**Conclusions of Law**

**Race and National Origin Discrimination—Counts 1 and 2—R.C. 4112 and Title VII**

{¶10} In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Little Forest Med. Ctr. v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 609-610 (1991). R.C. 4112.02 provides, in pertinent part, that: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the race . . . national origin . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment." "'To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent' and may establish such intent through either direct or indirect methods of proof." *Dautartas v. Abbott Labs.,* 2012-Ohio-1709, ¶ 25 (10th Dist.), quoting *Ricker v. John Deere Ins.* Co., 133 Ohio App.3d 759, 766 (10th Dist. 1998).

{¶11} In this case, plaintiffs seek to establish discriminatory intent through the indirect method, which is subject to the burden shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Nist v. Nexeo Solutions, LLC,* 2015-Ohio-3363, ¶ 31 (10th Dist.). "Under McDonnell Douglas, a plaintiff must first present evidence from which a reasonable [trier of fact] could conclude that there exists a prima facie case of discrimination." *Turner v. Shahed Ents.,* 2011-Ohio-4654, ¶ 11-12 (10th Dist.). "In order to establish a prima facie case, a plaintiff must demonstrate that he or she: (1) was a member of the statutorily protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside the protected class or that the employer treated a similarly situated, non-protected person more favorably." *Nelson v. Univ. of Cincinnati,* 2017-Ohio-514, ¶ 33 (10th Dist.).

{¶12} Plaintiffs failed to prove a prima facie case of race or national origin discrimination. Plaintiffs failed to prove by a preponderance of evidence that a similarly situated, non-protected person was treated more favorably.

{¶13} "To make a comparison between the plaintiff's treatment and the treatment of non-protected employees, 'the plaintiff must show that the "comparables" are similarly-situated in all respects.'" (Emphasis sic.) *Tilley v. Dublin*, 2013-Ohio-4930, ¶ 34 (10th Dist.), quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992). Plaintiffs must prove that "all of the relevant aspects of his employment situation were 'nearly identical' to those of the [comparable employee's] employment situation." (Emphasis sic.) *Pohmer v. JPMorgan Chase Bank*, 2015-Ohio-1229, 35 (10th Dist.) (cleaned up). "Thus, to be deemed similarly situated, the comparables must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (cleaned up); *see Osborne v. Ohio Reformatory for Women*, 2021-Ohio-1036, ¶ 23 (10th Dist.).

{¶14} "In practical terms, two employees are not similarly situated in all relevant respects if there is a meaningful distinction between them that explains their employer's different treatment of them . . . ." *Id.* at ¶ 37 quoting *Koski v. Willowwood Care Ctr. of Brunswick, Inc.*, 2004-Ohio-2668, ¶ 17-18, (9th Dist.).

{¶15} With respect to the non-renewal of their employment, plaintiffs failed to prove that other faculty members at UTMC failed to obtain necessary extramural grant funding yet remained employed at UTMC. Asea and Kaur believed that Andrea Kalinoski failed to obtain extramural grant funding. However, Kalinoski credibly testified that she is required to cover 30% of her salary through extramural grant funding and that she has obtained multiple NIH grants for that purpose. Kalinoski also credibly testified that there is a clause in her contract that also states that the revenue/invoices generated from running the core lab can be used to meet the requirement for extramural funding. Asea and Kaur's employment offer did not contain a clause allowing them to use revenue generated from running the lab to meet their extramural grant requirement nor did they obtain the required extramural grant funding. Plaintiffs also point to Dr. Steven Heller; however, there is no evidence that they are similarly situated in that there is no evidence regarding his funding requirements, and it is plaintiffs' burden to demonstrate that they are similarly situated. Accordingly, plaintiffs have not demonstrated that they were treated less favorably than other similarly situated employees.

{¶16} With respect to other instances where plaintiffs claimed to have been treated less favorably than other non-protected persons, plaintiffs failed to prove their claims by a preponderance of the evidence. Regarding cancelled lunch meetings with Dworkin, Dworkin credibly testified that he rarely eats lunch and typically does not invite anyone to eat lunch due to his own weight issues. Dworkin explained that once per month he met with the division chiefs, but Asea is not a division chief and would not have been included. Concerning faculty dinners referenced by Asea, Dworkin credibly testified that he lived alone and that his wife was in Connecticut and as a result, he did not invite anyone to his house for dinner. With respect to Asea's claim that leadership did not attend his presentation and that he was excluded from fishing trips, Cooper credibly explained that he rarely attends faculty presentations, that he has only been fishing with coworkers two times in the previous 30 years, and that he does not recall any request to go fishing with Asea. Turning to plaintiffs' claim that they did not receive a bonus for completing their MBA degrees while at UTMC, it was established that the bonus referenced applied to staff not faculty. Plaintiffs were faculty members and were thus ineligible for any such bonus. Finally, concerning Kaur's claim that Dworkin failed to mentor her, Dworkin

credibly explained that he met with Kaur more than any other faculty member at her rank and that he typically meets with division chiefs on a regular basis; Kaur is not a division chief.  Dworkin added that Kaur needed a more specific mentor in her area of research who is able to comment on her area of research whereas he is a nephrologist by training.

{¶17} Additionally, even if plaintiffs had established a prima facie case of race or national origin discrimination, plaintiffs failed to prove that UTMC's reasons for any adverse employment action were pretext for race discrimination.  "If the plaintiff meets her initial burden, the burden then shifts to the defendant to offer 'evidence of a legitimate, nondiscriminatory reason for' the adverse action. . . . If the defendant meets its burden, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason was actually a pretext for unlawful discrimination."  *Turner*, 2011-Ohio-4654, ¶ 14.

{¶18} "To establish pretext, a plaintiff must demonstrate that the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct.  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).  Regardless of which option is chosen, the plaintiff must produce sufficient evidence from which the trier of fact could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against [him or her].  *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).  A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.  *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993)."  *Knepper v. Ohio State Univ.,* 2011-Ohio-6054, ¶ 12 (10th Dist.).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

{¶19} Plaintiffs failed to prove that their failure to raise the required extramural grant funding was pretext for race or national origin discrimination.  The evidence established that plaintiffs did not obtain the required grant funding.  Plaintiffs submitted many grant applications; however, all but two were never funded.  Plaintiffs claimed at trial that they received grant funding from the NIH in the amount of $1.6 million.  However, the evidence established that the grant was awarded to Saori Furuta as a principal investigator, and Dworkin credibly testified that it was up to Furuta to determine to what

plaintiffs would be entitled. Defendant's Exhibit S. Additionally, Anne Diment, previously known by Izzi, credibly testified that Furuta, as the principal investigator could have used Asea's lab to run samples for the research or could have sent them to someone other than Asea. Accordingly, the grant was awarded to Furuta, and it was within Furuta's discretion to use Asea's lab or not. Moreover, Asea acknowledged that during his deposition he stated that they did not obtain grant funding; however, at trial he maintained that he had. Such an inconsistency in a central point of contention undermines his credibility. The other grant plaintiffs claim to have received was for $15,000, which even if they did obtain this grant, such funding is well short of the required extramural grant support necessary pursuant to their offer of employment. Thus, plaintiffs failed to show that they were awarded grant funding consistent with their appointments.

{¶20} Additionally, plaintiffs failed to establish that race or national origin discrimination was the real reason for the non-renewal of their employment. UTMC invested heavily in plaintiffs' potential success and provided them with additional time to obtain grant funding. The requirement for grant funding was made clear in their offer letters and again in an email outlining the requirement that researchers obtain grant funding. Ultimately, plaintiffs were not successful in obtaining grant funding. There is no credible evidence that the real reason that plaintiffs' employment was not renewed or that plaintiffs may have suffered any other adverse employment action was because of race or national origin discrimination. Accordingly, their claims for race or national origin discrimination fail.

**Retaliation—Counts 3-5—R.C. 4112 and Title VII; Count 3 Applies only to plaintiff Kaur**

{¶21} R.C. 4112.02(I) states that it shall be an unlawful discriminatory practice: "For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." "Absent direct evidence of retaliatory intent, Ohio Courts analyze retaliation claims using the evidentiary framework established by the United States

Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 . . . ." *Veal v. Upreach LLC*, 2011-Ohio-5406, ¶ 16 (10th Dist.). Indirect proof of retaliation is thus examined via a similar burden-shifting analysis to discrimination. The only difference is the elements of the prima facie case that plaintiffs must establish: "Specifically, the plaintiff must establish that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Id.* at ¶ 16.

{¶22} Protected activity involves either the "opposition clause," when an employee has opposed any unlawful discriminatory practice, or the "participation clause," when an employee has made a charge, testified, assisted or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code. *See Motley v. Ohio Civ. Rights Comm'n*, 2008-Ohio-2306, ¶ 10 (10th Dist.), citing *Coch v. GEM Indus., Inc.*, 2005-Ohio-3045, ¶ 29 (6th Dist.). After a plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Veal* at ¶ 17.

{¶23} "In order to prevail on a claim of retaliation where the employer has articulated a legitimate, nondiscriminatory reason, the plaintiff must prove not only that the proffered reason was a pretext, but also that the reason for the employer's action was unlawful retaliation . . . . In other words, it is not enough to disbelieve the employer; the trier of fact must also believe the plaintiff's explanation of intentional retaliation." *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210, ¶ 76 (10th Dist.). "A plaintiff may establish pretext by proving that: (1) the employer's stated reason for [the action] has no basis in fact, (2) the reason offered was not the actual reason for the [action], or (3) the reason offered was insufficient to explain the employer's action." *Id.* at ¶ 77.

{¶24} "To prevail on a retaliation claim, a plaintiff must 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" *EEOC v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015). Accordingly, plaintiff is required to "present evidence from which a reasonable [court as fact finder] could find

that [defendant] would not have [taken the alleged adverse employment actions] if she had not made her charge." *Id.*

{¶25} While the timing of an employee's termination can contribute to an inference of retaliation, temporal proximity alone is not sufficient to demonstrate a causal connection, and this is especially true where there are intervening performance concerns. *Sells v. Holiday Mgt. Ltd.*, 2011-Ohio-5974, ¶ 35 (10th Dist.).  If an adverse action was considered *before* plaintiff engaged in protected activity, there is no inference of causation.  *See Prebilich-Holland v. Gaylord Entertainment Co.,* 297 F.3d 438, 443-444 (6th Cir. 2002) (finding that close proximity creates no inference of causation when the termination procedure was instituted several days before knowledge of protected status or activity).  "[E]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Sosby v. Miller Brewing Co.,* 415 F. Supp. 2d 809, 822 (S.D.Ohio 2005), citing *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 834 (8th Cir. 2002).

{¶26} Here, plaintiffs were informed that their faculty appointments would not be renewed long before they brought claims of discrimination and retaliation to the attention of UTMC.  Plaintiffs were informed in December 2019 that their faculty appointments would not be renewed, and it had been made clear to them in their offer letter and again in an email on May 10, 2019, that their faculty appointments required extramural grant funding.  Dworkin credibly testified that anyone working in an academic setting should understand this basic requirement.  Plaintiffs initiated formal grievance for discriminatory practices on September 23, 2020, well after they were aware that their faculty appointments would not be renewed due to their failure to obtain extramural grant funding. Defendant's Exhibit T.  Accordingly, there is no causal connection.

{¶27} Turning to Kaur's complaint regarding what she viewed to be a sexist comment, such a claim only pertains to Kaur and not Asea as the amended complaint explicitly states that such a claim only applies to Kaur.  Nevertheless, Kaur failed to establish a causal link between her protected activity and any adverse action, such as a demotion or a denied track change.  As explained above, Cooper credibly testified that Kaur's appropriate track was the one in which she was assigned and her faculty rank was set by the APT, not by the offer letter; thus, Kaur was never demoted as she never had

the rank of an Associate Professor. Additionally, Cooper was not aware of any report of a sexist comment. Accordingly, any denied request to change tracks or faculty rank appointment were not connected to the report of a sexist comment.

{¶28} Furthermore, as has already been explained above, plaintiffs failed to prove that the reason for the nonrenewal of their faculty appointments—failure to obtain grant funding—was pretextual for unlawful retaliation. The credible evidence establishes that plaintiffs were required to obtain extramural grant funding, and they failed to do so. Plaintiffs knew or should have known based on their offer letters that they were required to obtain grant funding. Any misunderstanding should have been clarified by May 10, 2019, when Dworkin sent an email informing plaintiffs of the requirement to obtain extramural grant support. Plaintiffs failed to obtain the necessary funding; thus, plaintiffs failed to establish pretext. Moreover, plaintiffs failed to prove that their grievance (or report of a sexist comment) was a but-for cause for the nonrenewal of their faculty appointments, or in Kaur's case, a reason for a denied track change or appointment as an Assistant Professor.

{¶29} Based upon the foregoing, it is recommended that judgment be entered in favor of defendant.

{¶30} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

GARY PETERSON
Magistrate

**Filed August 16, 2024**
**Sent to S.C. Reporter 9/19/24**